**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:19-cr-81 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| ANTHONY RATTINI, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

**ORDER DENYING THE PHARMACY DEFENDANTS' MOTION
TO DISMISS (DOCS. 72, 75) THE INDICTMENT**

---

This case is before the Court on Defendant Devonna Miller-West's Motion to Dismiss (Doc. 72) the Indictment under Federal Rule of Criminal Procedure 8(b) on the grounds that Defendants have been impermissibly joined in one action. Defendant Samuel R. Ballengee moved to adopt Ms. Miller-West's Motion. (Doc. 75.) As the Indictment contains similar allegations regarding Ms. Miller-West and Mr. Ballengee, who both own and operate a pharmacy, Mr. Ballengee's motion is granted. For purposes of this Order, the Court collectively refers to Ms. Miller-West and Mr. Ballengee as the "Pharmacy Defendants."

Upon review, the Government has alleged a single conspiracy to violate the drug laws under 21 U.S.C. § 846. Moreover, even it had not done so, the proper remedy for improper joinder under Rule 8(b) is severance, not dismissal. Accordingly, the Pharmacy Defendants' Motion to Dismiss the Indictment is **DENIED**.

FACTS

The Indictment alleges that, from January 2008 through December 2015, a pharmaceuticals distributor named Miami-Luken conspired with two pharmacists (and the pharmacies they each individually owned and operated) to distribute oxycodone and hydrocodone outside the scope of professional practice and not for a legitimate medical purpose. Defendants allegedly engaged in the conspiracy to profit from the unlawful distribution and dispensation of controlled substances, including distributing and dispensing large amounts of opioids to known pill mills, and facilitating the diversion of oxycodone and hydrocodone for illicit use.

Defendant Miami-Luken is the pharmaceuticals distributor. Now closed, it was located in Springboro, Ohio and supplied pharmaceuticals to over 200 pharmacies in Ohio, West Virginia, Kentucky, Indiana and Tennessee. During the relevant period, it generated more than $173,000,000 in consolidated sales per year, with 70% of its profits coming from wholesale distribution. Defendant Anthony Rattini was Miami-Luken's President and defendant James Barclay was its Compliance Officer.

Defendants Devonna Miller-West and Samuel R. Ballengee are both pharmacists licensed in the State of West Virginia. Ms. Miller-West owned and operated Westside Pharmacy in Oceana, West Virginia, and Mr. Ballengee owned and operated Tug Valley Pharmacy in Williamson, West Virginia. Both Westside Pharmacy and Tug Valley Pharmacy purchased controlled substances from Miami-Luken for sale to their customers.

The Controlled Substances Act (CSA) governs the manufacture, distribution, and

dispensation of controlled substances in the United States. The DEA enforces the CSA and its implementing regulations by conducting audits and inspections, reviewing sales data and suspicious order reports, and issuing guidance to registrants as necessary.

A pharmaceuticals distributor, like Miami-Luken, must register with the DEA in order to distribute controlled substances. Medical professionals, including pharmacists, who want to distribute or dispense controlled substances are required to register with the United States Attorney General and are assigned a registration number by the DEA. All of the defendants in this case were registered to conduct their businesses.

## ANALYSIS

Ms. Miller-West argues that Defendants were improperly joined in this action because the Indictment describes several conspiracies, each between an individual pharmacist and Miami-Luken; not one large general conspiracy among the group as a whole.

### A.    The Federal Rules of Criminal Procedure

Rule 8(b) of the Federal Rules of Criminal Procedure provides that an indictment may charge two or more defendants together "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "As a general rule, especially in conspiracy cases, parties who are jointly indicted should be tried together." *United States v. Dempsey*, 733 F.2d 392, 398 (6th Cir. 1984). A different policy would pose problems for the criminal justice system, because "[s]eparate trials produce additional labor for judges and juries, which results from the unnecessary repetition of evidence and trial procedures." *See*

*United States v. Caver*, 470 F.3d 220, 238 (6th Cir. 2006). Thus, under Rule 8(b), "the predominant consideration is whether joinder would serve the goals of trial economy and convenience." *Swift*, 809 F.2d at 322.

Severance is the proper remedy for improper joinder under Rule 8(b). *United States v. Lloyd*, 10 F.3d 1197, 1214 (6th Cir. 1993). Where a court permits the misjoinder of defendants, reversal is required only if the misjoinder results in actual prejudice because it "had substantial and injurious effect or influence in determining the jury's verdict." *United States v. Lane*, 474 U.S. 438, 449 (1986) (quoting *Kotteakos*, 328 U.S. at 776).

### B. **The Relevant Caselaw**

Many courts have grappled with the question of who may be charged with participating in a conspiracy. In this case, the Pharmacy Defendants specifically rely on *Kotteakos v. United States*, 328 U.S. 750 (1946), *Blumenthal v. United States*, 332 U.S. 539 (1947), and *Poliafico v. United States*, 237 F.2d 97 (6th Cir. 1956). The Court discusses each of these cases in turn before turning to the parties' arguments below.

### 1. *Kotteakos v. United States*, 328 U.S. 750 (1946)

The Pharmacy Defendants argue that the conspiracy alleged in this case is most analogous to the conspiracy in *Kotteakos*. In that case, "[t]he gist of the conspiracy, as alleged, was that the defendants had sought to induce various financial institutions to grant credit, with the intent that the loans or advances would then be offered to the Federal Housing Administration for insurance upon applications containing false and fraudulent information." *Kotteakos*, 328 U.S. at 752.

The indictment named thirty-two defendants, but the central figure was the broker

4

who placed loans under the National Housing Act. The broker's alleged co-conspirators were applicants who lied about the purpose of their loans and applied for loans using fictitious names. The broker knew, at the time of their placement, that the loans were not going to be used for their stated purposes. The evidence did not show any connection between the loan applicants, other than that they used the same broker.

It was undisputed in *Kotteakos* that the evidence established several conspiracies. The only question was whether—applying the "harmless error" statute—defendants suffered substantial prejudice from being tried for engaging in a single general conspiracy. *Id.* The Supreme Court held that they did.

The Supreme Court began its analysis with *Berger v. United States*, 295 U.S. 78 (1935). In *Berger*, four defendants were charged with engaging in a single conspiracy to pass counterfeit money. At trial, however, the evidence established two separate conspiracies involving a common defendant, not the single conspiracy alleged in the indictment. Despite this error, the defendants' substantial rights were not prejudiced. The Court found the evidence generally conformed to the conspiracy charge—the government proved two conspiracies to pass counterfeit money—and the improper charge did not prejudice the defendants' preparation for trial.

In contrast, in *Kotteakos* the Supreme Court concluded that charging a single conspiracy had prejudiced the defendants' substantial rights. The "essential difference" between the two cases was the number of conspiracies and defendants involved. *Kotteakos*, 328 U.S. at 766. In *Berger*, where no prejudice was found, there were two conspiracies involving four individuals. In *Kotteakos*, eight separate conspiracies were

5

shown to have existed involving, at the outset, thirty-two individuals. The Supreme Court explained, "the burden of defense to a defendant, connected with one or a few of so many distinct transactions, is vastly different not only in preparation for trial, but also in looking out for and securing safeguard against evidence affecting other defendants, to prevent its transference as 'harmless error' or by psychological effect, in spite of instructions for keeping separate transactions separate." *Kotteakos*, 328 U.S. at 766–67.

The Supreme Court rejected the government's argument that any error was harmless because the evidence was sufficient to convict each defendant, even if they had been separately tried. It noted that the trial court had instructed the jury that the evidence must establish the defendants' participation in only one conspiracy— "You cannot divide it up." *Id.* at 767. The trial court's instruction was based on its erroneous view that one conspiracy could be established by showing each loan applicant was linked to the broker and the "similarity of purpose presented in various applications for loans." *Id.* at 768-69. This view confused "the common purpose of a single enterprise with the several, though similar, purposes of numerous separate adventures of like character." *Id.* at 769.

Due to the complexity of the evidence and trial court's erroneous instructions, the Supreme Court could not assume the jury understood the law well enough to disregard the court's charge and find the defendants guilty of the separate conspiracies in which they participated. The defendants' substantial rights were therefore prejudiced— namely, "the right not to be tried en masse for the conglomeration of distinct and separate offenses committed by others as shown by this record." *Id.* at 775.

When considering the import of *Kotteakos* in this case, the Court is mindful that the

parties did not dispute that the government's evidence proved several conspiracies. In other words, the Supreme Court did not decide the question before this Court—whether the Indictment properly joined the defendants as participants in a single conspiracy. It only determined that the improper charge in that case prejudiced the defendants' substantial rights.

Nonetheless, *Kotteakos* still provides some guidance. At the least, it stands for the proposition that a common defendant is not enough to establish a single conspiracy, even if that defendant facilitates the criminal acts of the other defendants. This proposition holds even if the other defendants are engaged in "separate adventures of like character." *Id.* at 769. In *Kotteakos*, the broker participated in the loan applicants' individual schemes to defraud a government loan program but was not alleged to be the mastermind or orchestrator of an overarching conspiracy.

### 2. *Blumenthal v. United States*, 332 U.S. 539 (1947)

The Sixth Circuit has commented that any understanding of *Kotteakos* "is inadequate if not supplemented by consideration of *Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947)." *United States v. Pickett*, 746 F.2d 1129, 1133 (6th Cir. 1984). In *Blumenthal*, the Supreme Court "directly considered the issue dealt with only in dicta in *Kotteakos*: how to draw the line between one conspiracy and multiple conspiracies." *Id.*

*Blumenthal* involved five defendants charged with conspiring to sell 4,000 cases of whiskey at prices above a wholesale price ceiling. There were two central figures and three distributors. One of the central figures was a wholesale liquor dealer, who received

the whiskey from the distiller and stored it in a warehouse. The second central figure was the dealer's sales manager. The three distributors arranged sales and deliveries to tavern owners.

The government had charged the case as a single conspiracy, but conceded that, if more than one conspiracy was proved, then the defendants were prejudiced. This position was essentially the reverse of its position in *Kotteakos*, where it had conceded that several conspiracies were proved but argued no prejudice had occurred. *Blumenthal*, 332 U.S. at 548.

The *Blumenthal* defendants argued, in part, that there was no single conspiracy because the distributors did not know the actual owner of the whiskey — the person who had devised the unlawful scheme. That fact, however, was not essential to prove the government's case. The Supreme Court acknowledged the conspiracy might be regarded as progressing in two phases. In one phase, there was an agreement among the liquor dealer, his sales manager and the unknown owner. In the other phase, there was an agreement among all five of the defendants regarding distribution, to which the unknown owner was not a party. The liquor dealer and sales manager were common to both agreements. *Blumenthal*, 332 U.S. at 556.

The fact that all members of the conspiracy were not known to each other did not undermine the existence of a single conspiracy. "Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their

8

connections with it, without requiring evidence of knowledge of all its details or of the participation of others." *Id.* at 557.

The agreements, though separate, shared a common purpose, namely "illegal sales in the guise of legal ones." *Id.* at 557. The fact of who owned the whiskey was not essential to accomplishing this illegal end. And, the Supreme Court reasoned, "the salesman "knew or must have known that others unknown to them were sharing in so large a project; and it hardly can be sufficient to relieve them that they did not know, when they joined the scheme, who those people were or exactly the parts they were playing in carrying out the common design and object of all." *Id.* at 558. "By their separate agreements, if such they were, they became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal." *Id.*

The Supreme Court distinguished the facts in *Blumenthal* from those in *Kotteakos*:

Apart from the much larger number of agreements there involved, no two of those agreements were tied together as stages in the formation of a large all-inclusive combination, all directed to achieving a single unlawful end or result. On the contrary each separate agreement had its own distinct, illegal end. Each loan was an end in itself, separate from all others, although all were alike in having similar illegal objects. Except for [the broker], the common figure, no conspirator was interested in whether any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with [the broker] and also in the absence of any aid given to others as well as in specific object and result. There was no drawing of all together in a single, over-all, comprehensive plan.

*Blumenthal*, 332 U.S. at 558.

9

The Supreme Court acknowledged the risk of a jury, consciously or unconsciously, transferring the evidence of one defendant's guilt to another defendant, despite an instruction to the contrary. Having found the evidence sufficient to establish a single conspiracy, however, the risk of jury confusion was not as significant as in *Kotteakos*. The trial court reduced that risk by instructing the jury not to consider certain admissions related to the dealer and sales manager against the distributors. The court also "expressly told the jury . . . the guilt or innocence of each defendant must be determined by the jury separately. Each defendant has the same right to that kind of consideration on your part as if he were being tried alone." *Id.* at 560. In sum, the government did not improperly join the defendants and the trial court properly instructed the jury regarding its consideration of the evidence.

### 3. *Poliafico v. United States*, 237 F.2d 97 (6th Cir. 1956)

The Pharmacy Defendants also refer to the Sixth Circuit's decision in *Poliafico v. United States*, 237 F.2d 97 (6th Cir. 1956), which involved a conspiracy to sell heroin. In that case, the government charged twenty defendants in the conspiracy, eighteen of which went to trial. On appeal, nine of the convicted defendants argued that, "while the government charged a single conspiracy, its evidence only purported to disclose, instead, a number of different conspiracies; that the parties alleged to be in one of the conspiracies were not proved to be in the other conspiracies; and that, accordingly, there was a fatal variance between the indictment and the proof." *Poliafico*, 237 F.2d at 102.

The facts may be briefly summarized as follows. Poliafico was the ringleader of the conspiracy, which was based in Cleveland, Ohio. He negotiated with two individuals

10

to transport a half kilo of pure heroin from New York City to Cleveland and solicited two others to distribute the heroin for a weekly salary.  Poliafico and the individuals from New York City worked together to mix the pure heroin with a cutting agent and package it for sale.  Poliafico and his associates sold the heroin, after which Poliafico paid for it and arranged for additional heroin to be transported.  The arrangement followed this pattern—receipt of heroin, mixing it, selling it, paying for it, and repeat.

In addition to Poliafico and these four individuals, a fifth member of the conspiracy, after being recruited by one of the New York members, also delivered heroin from New York and collected payments at various times when he made deliveries.  Additional defendants are alleged to have negotiated in New York to obtain more heroin for Poliafico and arranged or participated in the delivery of narcotics.

Addressing the question of whether the appellants engaged in the same conspiracy, the Sixth Circuit observed that "[a]ll of the appellants were either selling heroin to Poliafico and his associates, or reselling it for them, or carrying on negotiations for such sales, or making payments therefor, or delivering heroin for resale, or reselling it."  *Poliafico*, 237 F.2d at 103.  All of the purchases and sales were part of the same enterprise, "which could be called the Poliafico deal, in the parlance of the underworld."  *Id*.  "The over-all conspiracy was the plan, conceived by Poliafico and his associates, to buy and sell heroin at a profit."  *Id.* at 103-04.

The Sixth Circuit held the evidence established only one conspiracy to buy and resell heroin.  It explained:

The proofs of the government show that all appellants were associated in

11

this scheme, some by virtue of selling or delivering the heroin to the
Poliafico group, others because of being associated with the group in
carrying out the scheme, collecting money through resales of the drug,
making payments to suppliers, or carrying on negotiations for the purchase
or resale. All appellants knew of the conspiracy. The suppliers knew that
the Poliafico group must resell the heroin at a profit; and all associated with
Poliafico in the resale of the heroin knew that Poliafico must buy it from
suppliers and that the resales must be at a profit. 'One who commits an
overt act with knowledge of the conspiracy is guilty, even though he is
absent when the crime, which is the object of the conspiracy, is committed.
Such person's knowledge as to the scope of the conspiracy, may be limited,
and he need not know all the details of the plan or the operations.
Knowledge of membership in the conspiracy, the part played by each of the
members, and the division of spoils is immaterial. [H]e must know the
purpose of the conspiracy, however, otherwise he is not guilty.' *Marino v.
United States*, 9 Cir., 91 F.2d 691, 696, 113 A.L.R. 975.

*Poliafico*, 237 F.2d at 104.

The Sixth Circuit distinguished *Kotteakos* because the evidence in that case

"disclosed eight or more conspiracies by separate groups of defendants which had no

connection with each other except that they utilized one Brown as a broker to handle

fraudulent applications for loans." *Id*. at 105. Instead, the *Poliafico* defendants were like

the defendants in *Blumenthal*, where all of the defendants "knew of and joined in the

overriding scheme." *Id*. (internal quotes omitted) (quoting *Blumenthal*, 332 U.S. at 558).

12

C.    <u>Applying the Law to the Allegations in this Case</u>

The Pharmacy Defendants argue that the alleged conspiracy in this case is analogous to the conspiracy in *Kotteakos* and distinguishable from the conspiracies in *Blumenthal* and *Poliafico*. They assert that, as in *Kotteakos*, there is no overriding scheme or plan alleged in this case, nor the "drawing of all together in a single, over-all, comprehensive plan." (Doc. 72 at PageID# 278, quoting *Blumenthal*, 332 U.S. at 558.) They cite the following facts in support of their argument. First, there is no allegation that Ms. Miller-West or Mr. Ballengee were aware of the other pharmacies that Miami-Luken serviced, what types of orders the other pharmacies placed, or what type of prescriptions the other pharmacies filled. Second, the Government does not allege that the Pharmacy Defendants knew that any other pharmacies were distributing controlled substances outside the scope of professional practice and not for a legitimate medical purpose. Third, it is not alleged that Ms. Miller-West or Mr. Ballengee had any interest in what controlled substances Miami-Luken sold to other pharmacies or assisted other pharmacies in their distribution of controlled substances. In conclusion, they reason that, without any direct relationship alleged among the named (and unnamed) Pharmacy Defendants, there is no overarching conspiracy in this case.

The Government's initial response is that, even if joinder of all Defendants were not appropriate under Rule 8(b), the remedy would be severance, not dismissal. On this point, the Government is correct. In *Kotteakos*, after finding that the parties were improperly joined, the Supreme Court remanded the case for separate trials—not dismissal of the indictment. *Kotteakos*, 328 U.S. at 777.

The Government also argues that, in order to prove a conspiracy, it need not show that every member knew each other. This argument is also correct. The Court need look no further than *Poliafico*, which Ms. Miller-West cites, for this proposition. *See Poliafico*, 237 F.2d at 104 ("Knowledge of membership in the conspiracy, the part played by each of the members, and the division of spoils is immaterial" to finding a defendant guilty of participation in a conspiracy.) (quoting *Marino v. United States*, 91 F.2d 691, 696 (9th Cir. 1937)). In this case, the Government alleges a conspiracy under 21 U.S.C. § 846 to distribute controlled substances as prohibited by 21 U.S.C. § 841. "In order to show a conspiracy under § 846, the government must prove, beyond a reasonable doubt, '(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy.'" *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999) (quoting *United States v. Welch*, 97 F.3d 142, 148 (6th Cir.1996), cert. denied, 519 U.S. 1134 (1997)). Personal knowledge of each of the other participants in the conspiracy is not required.

In response to the Pharmacy Defendants' broader contention—that there is no overarching conspiracy alleged in this case, the Government argues that it has in fact alleged a large-scale conspiracy to distribute controlled substances for unlawful purposes. Miami-Luken allegedly orchestrated the conspiracy by moving its business to doctors and pharmacists that prescribed and filled prescriptions for controlled substances without a legitimate medical purpose. The Government thus casts Miami-Luken in the same role as Poliafico in *Poliafico* or the liquor dealer in *Blumenthal*. Miami-Luken is not alleged to be a mere broker, as in *Kotteakos*, playing a supporting role in individual

14

pharmacies' separate conspiracies to violate the drug laws.  Instead, the Government alleges that Miami-Luken directed the conspiracy forming relationships with pharmacies that would fill illegal prescriptions (to all conspirators' financial benefit).  These allegations describe a single conspiracy to illegally distribute narcotics.

The Pharmacy Defendants are correct there are no allegations that they had any direct interest in each other's success, or the success of any other unnamed pharmacy co-conspirator.  They did, however, have an interest in the success of the enterprise.  *United States v. Henley*, 360 F.3d 509, 513 (6th Cir. 2004) ("Drug distribution conspiracies are often 'chain' conspiracies such that agreement can be inferred from the interdependence of the enterprise.").  Namely, they financially benefitted from Miami-Luken's unimpeded distribution of the large volume of narcotics needed to fill their illegal prescriptions.  If Miami-Luken failed to deliver, then the Pharmacy Defendants would lose customers and the profits that came with them.

The Pharmacy Defendants finally argue that this case is distinguishable from *Poliafico* and *Blumenthal* because, in those cases, knowledge of the unlawful conspiracy could be inferred from the fact that selling heroin and selling whiskey above regulation, respectively, are illegal under all circumstances.  This argument goes to whether the Government can prove the first element of a § 846 conspiracy — an agreement to violate the drug laws.  The Pharmacy Defendants also contend this element cannot be proved by showing a "tacit understanding" among the participants.  (Doc. 72 at PageID# 279, citing *United States v. Gurry*, 427 F. Supp. 3d 166 (D. Mass. 2019).)  In *Gurry*, the district court considered similar arguments while evaluating the defendants' motion for acquittal

15

under Fed. R. Crim. P. 29. Here, the Government alleges the evidence will show Defendants knew that they were violating the drug laws due to numerous red flags (which were ignored) and the sheer volume of prescriptions being filled for the population being served. The question of whether or not the Government's evidence is sufficient to make this showing is best reserved for a Rule 29 motion, as in *Gurry*.

## CONCLUSION

For the above reasons, including that dismissal of the Indictment is not the proper remedy for improper joinder under Fed. R. Crim. P. 8, the Pharmacy Defendants' Motion to Dismiss is **DENIED**.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND